**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. | ) | |
| NETTLETON LINE CONSOLIDATED SCHOOL DISTRICT, *et al.*, | ) | Civil Action No. 1:69CV063 |
| Defendants. | ) | JUDGE MICHAEL P. MILLS |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR DECLARATION OF UNITARY STATUS AND DISMISSAL**

Plaintiff United States of America (the "United States") and Defendants Nettleton Line Consolidated School District, Nettleton Superintendent Ken Byars, and Nettleton School Board Members Willie Brandon, Ty Humble, James Malone, Merle McAnally, and Gary Scott (collectively, the "District") (together, the "Parties") respectfully file this Memorandum in Support of Joint Motion for Declaration of Unitary Status and Dismissal, and state as follows:

## I. PROCEDURAL HISTORY

Prior to 1965, the Nettleton School District (the "District") maintained *de jure* racial segregation in its schools, with white students and faculty assigned to Nettleton Line School and black students and faculty assigned to Sims School. 2020 Consent Order 1, ECF No. 13 (citing Stipulation ¶ 7, Dec. 8, 1969). From 1965 through 1968, the District operated under a freedom of choice attendance plan. *Id.* at 1–2 (citing Stipulation ¶ 8, Dec. 8, 1969). When the freedom of choice plan proved unsuccessful, the District agreed to adopt and implement a desegregation plan to consolidate all grade levels across both schools beginning in the 1969-1970 school year. *Id.* at 2 (citing Stipulation ¶ 14, Dec. 8, 1969). The Court subsequently issued several consent

orders to enforce the desegregation of the District: the 1969 Consent Decree permanently enjoined the District from interfering with desegregation efforts; the 1970 Consent Decree directed the District to address racial discrimination in its employment practices and other areas of its operations; and the 2011 Consent Order required the District to "terminate all race-based selection and election procedures" for extracurricular activities. *Id.* at 4 (citing Consent Decree, Dec. 8, 1969); *Id.* at 6 (citing Consent Decree, June 19, 1970); 2011 Consent Order, ECF No. 5.

In 2020, the Court issued a Consent Order ("2020 Consent Order") finding that the District had "eliminated the vestiges of *de jure* segregation" in student assignment, facilities, staff, and extracurricular activities. 2020 Consent Order 12, 19-20, ECF No. 13. The Court ordered additional remedial measures in the areas of faculty and transportation. *Id.* at 18, 22. In the area of faculty, the District was required to take steps to "increase its recruitment of black applicants for teacher vacancies," eliminate "any real or perceived racial barriers in hiring," and "retain qualified, black faculty members who are employed by the District." *Id.* at 22. To eliminate the vestiges of *de jure* segregation in transportation, the District was required to eliminate "overlapping or duplicative bus routes to the extent practicable" and to eliminate or reduce "the number of racially identifiable bus routes – or at least mitigat[e] the disparities between the percentages of black and white students assigned to each racially identifiable bus route – to the extent practicable" without "substantially increas[ing]" the amount of time that students spend on the District's buses. *Id.* at 26.

The 2020 Consent Order required the District to file a report with the Court by October 1 of each year, detailing the District's progress in eliminating the vestiges of *de jure* segregation in faculty and transportation. *Id.* at 27. The District has fully complied with this reporting requirement, filing annual reports by October 1 of each year since the 2020 Consent Order was

issued. In addition to reviewing the District's annual reports and providing feedback to the District, counsel for the United States conducted an in-person site visit in January 2024 and a virtual site visit in February 2024 to monitor implementation of the 2020 Consent Order.

## II. LEGAL STANDARD

The goal of a school desegregation case is to convert a *de jure* segregated school system to a "system without a 'white' school and a '[black]' school, but just schools." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 442 (1968). The ultimate inquiry in determining unitary status is whether the school district has (1) fully and satisfactorily complied in good faith with the court's desegregation orders for a reasonable period of time; (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable; and (3) demonstrated a good faith commitment to the whole of the court's order and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *See Missouri. v. Jenkins*, 515 U.S. 70, 88–89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491–92, 498 (1992); *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248–50 (1991).

"The purposes of the desegregation litigation [are] fully achieved" when a school district actively complies with its desegregation obligations and is deemed unlikely to "return to its former ways." *Dowell*, 498 U.S. at 247. To that end, a district must demonstrate its "affirmative commitment to comply in good faith with the entirety of a desegregation plan," and that it has not "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." *Freeman*, 503 U.S. at 499. The goal of the Court is to determine whether the district "has done all that it could to remedy the segregation caused by official action." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991).

The U.S. Supreme Court has identified six areas, commonly referred to as the "*Green* factors," which must be addressed as part of the determination of whether a school district has fulfilled its duties and eliminated vestiges of the prior dual school system to the extent practicable. These factors are: (1) student assignment; (2) faculty; (3) staff; (4) transportation; (5) extracurricular activities; and (6) facilities. *See Green*, 391 U.S. at 435–42. Courts may allow partial or incremental dismissal of a school desegregation case before full compliance has been achieved in every area of school operations—that is, courts may retain jurisdiction over those areas not yet in full compliance while terminating jurisdiction over those areas in which compliance was found. *Freeman*, 503 U.S. at 489.

## III. STIPULATED FACTS

### A. Transportation

The 2020 Consent Order requires the District to review all existing bus routes before the beginning of each school year to adjust overlapping or duplicative bus routes if practicable, and to assign new students to bus routes.[1] This review is conducted by the District's Transportation Director, who is knowledgeable about the goals and requirements of the 2020 Consent Order. Byars Aff. 2, ECF No. 21. As part of this review process, the District eliminated all bus routes that were 100% black or 100% white. *Id.*; Report of Nettleton School District 16–51, ECF No. 17. The District averred that it made its best efforts to reduce the number of racially identifiable bus routes and to decrease racial disparities on all bus routes, to the extent practicable, while not substantially increasing the amount of time students spend being transported to and from school on the District's buses. Byars Aff. 2, ECF No. 20; Byars Aff. 2, ECF No. 21. As a result, any

[1] The District stated that it is unable to purchase computer software to develop, adjust, or assign students to bus routes because the software is prohibitively expensive. Byars Aff. 2, ECF No. 20.

racial disparities that exist on the District's bus routes are not vestiges of *de jure* segregation. Byars Aff. 2, ECF No. 20.

Thus, in the area of transportation, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, and is, therefore, entitled to a declaration of unitary status with respect to this *Green* factor.

**B. Faculty**

The 2020 Consent Order required the District to increase its recruitment of black applicants for teaching vacancies, conduct its hiring with the goal of eliminating any real or perceived racial barriers in hiring, and retain qualified, black faculty members who are employed by the District. The Order also required the District to retain a Third-Party Consultant to assist the District in meeting these goals.[2] The District complied in good faith with the terms of the 2020 Consent Order and has eliminated the vestiges of past *de jure* segregation regarding faculty.

**1. Recruitment**

The 2020 Consent Order required the District to increase recruiting efforts targeting black applicants for teacher positions. Specifically, the Order required the District to recruit teacher applicants from historically black colleges and universities (HBCUs), send job postings to certain HBCUs located within 200 miles of the District, and post teaching vacancies on at least one website targeting black educators. In addition, the Order required the District to post all teaching vacancies on the District's and the Mississippi Department of Education's websites,

---

[2] The District retained the Intercultural Development Research Association, which was the Equity Assistance Center serving Mississippi at the time, as its Third-Party Consultant. Report of Nettleton School District 73, ECF No. 17.

create a Community Advisory Committee to help develop and implement the District's Faculty Recruitment Plan, and designate a District employee to oversee the implementation of remedies in the Order, to coordinate with the third-party consultant and the Community Advisory Committee, and to report directly to the Superintendent.

The District thoroughly implemented these recruitment strategies. In fact, the District implemented additional recruitment strategies that were not required by the 2020 Consent Order. For example, after the 2020 Consent Order was issued, the District sent a personal email to the education department of every HBCU in Mississippi requesting a meeting to discuss a partnership to place new teachers in the District and inviting current students in teacher education programs to attend professional development events in the District for free. Report of Nettleton School District 73, ECF No. 17. The District received no responses to its emails, and the following school year, a District employee called and emailed every HBCU in Mississippi to discuss potential partnerships. *Id.* Additionally, the employee contacted the University of Mississippi to discuss a partnership targeting recipients of minority scholarships and education majors at the University of Mississippi, Tupelo campus, which is located approximately 15 miles from the District. *Id.* Although the District did not receive responses to this broad outreach, the District eventually made contact with Alcorn State University through a former District student enrolled at the University. *Id.*; Byars Aff. 2, ECF No. 21. The District met with Alcorn State University's Director of Field Experiences and shared marketing and recruitment materials to promote the District's teaching opportunities. Report of Nettleton School District 73-74, ECF No. 17. The District attempted to register for Alcorn State University's Career Expo in Spring 2024, but the District was placed on a waitlist because the event was at capacity. Byars Aff. 2,

ECF No. 21. The District's Superintendent, Assistant Superintendent, and a principal attended the Educator Recruitment Fair at the University of Mississippi in Spring 2024. *Id.*

In addition to posting teaching vacancies on the District's and the Mississippi Department of Education's websites, in April 2023, the District posted four teaching positions on HBCUConnect.com. Report of Nettleton School District 74, ECF No. 17. This website targets students and alumni of HBCUs. *Id.* Three hundred individuals viewed the District's job postings, although no applicants applied for the positions directly through HBCUconnect.com. *Id.* Because the cost of each job posting on HBCUconnect.com is not insignificant, the District posted one teaching position on this website in July 2024 to continue promoting the District and targeting black applicants. Byars Aff. 2-3, ECF No. 21. The District also identified several Facebook groups targeting black teachers in Mississippi. Report of Nettleton School District 74, ECF No. 17. The District has posted, and will continue to post, available teaching positions on these social media pages. *Id.*

Additionally, the District developed marketing and recruitment materials to create a "welcome package" for applicants and new hires. *Id.* at 75-76. The welcome package includes introductory messages from the Superintendent and members of the Community Advisory Committee, statements from current teachers explaining why they enjoy working in the District, statements from community members explaining what makes Nettleton and the District special, and a list of school and community events. *Id*. The welcome package is updated annually. *Id.* at 76. A flyer with a QR code to access the welcome package is posted in every school's office. *Id.*

Another aspect of the District's recruitment plan is a "grow your own" teacher strategy, which focuses on developing and recruiting District students who may become teachers after graduation. *Id.* The District is committed to developing clubs for students interested in teaching.

*Id.* The "Teachers of Tomorrow" club launched in the Fall of 2022 at Nettleton High School and continues to grow and develop. *Id.* The "S.W.A.T. Team" club, which stands for "students who are teachers," launched in Spring 2023 and matches high school students with intermediate school students who need tutors. *Id.* Nettleton High School's career coach also posts education-related opportunities in the Nettleton area for interested students. *Id.*

Finally, the District created the Community Advisory Committee, which is comprised of a diverse group of Nettleton residents. Report of Nettleton School District 80, 93, ECF No. 17. The Community Advisory Committee shares District-related developments with community members and serves as a resource for community members to ask questions and seek information. *Id.* at 81. Additionally, the Community Advisory Committee helps the District implement its teacher recruitment strategies and evaluates the District's recruiting strategies annually through data collected from applicants during the interview process. *Id.* at 76–77, 93. Applicants are asked how they heard about the job opportunity, why they are interested in the District, and how the District can improve its recruitment methods. *Id.* The Community Advisory Committee uses this data to determine whether the District's recruiting strategies are effective and how those strategies can be improved. *Id.* The District plans to recruit new Community Advisory Committee members every two years, and each member's picture, biography, and contact information is available on the District's website. *Id.* at 80–81.

**2. Hiring**

In the 2019-2020 school year, before the 2020 Consent Order was issued, two of the District's 87 teachers were black. 2020 Consent Order 71, ECF No. 13. In the 2023-2024 school year, of the District's 90 teachers, two teachers at Nettleton High School were black and four teachers at Nettleton Jr. High School were black. *Id.* at 6–7. Thus, the percentage of black

teachers in the District has increased from 2.3% to 6.7% since the Court issued the 2020 Consent Order. Byars Aff. 3, ECF No. 21; 2020 Consent Order 71, ECF No. 13.

The 2020 Consent Order required the District to provide applicants for teacher vacancies an opportunity to voluntarily self-identify their race. Using this data, the District must track the race of applicants who apply, are interviewed, and are hired for each teaching position. When teachers separate from employment with the District, the District must maintain a record of the teacher's race and whether the teacher resigned, retired, or was terminated and the reasons for such termination. Additionally, the 2020 Consent Order required the District to retain all employment applications for teaching positions and all other records related to recruiting, hiring, promoting, demoting, and firing teachers for at least three years.

The District fully satisfied these requirements and implemented additional strategies to address the goal of eliminating any real or perceived racial barriers in hiring. Each school now has a hiring committee that includes at least one black teacher, counselor, or administrator. Report of Nettleton School District 78, 84, ECF No. 17. If a school does not employ a black teacher, counselor or administrator, a black teacher, counselor, or administrator from another school serves on the hiring committee. *Id.* at 78.

Hiring committees track all applicants' progress at each stage of the hiring process on a spreadsheet, which includes an explanation of why the applicant did, or did not, progress to the next round of the hiring process. *Id.* at 9-15, 87–88. This spreadsheet is available to all hiring committee members, as well as District administrators, and serves as a tool to ensure transparency throughout the hiring process. Byars Aff. 3, ECF No. 21. Hiring committee members have expressed overwhelmingly positive feedback on this tool. *Id.*

The District provides two mandatory professional development opportunities annually related to the District's recruitment, hiring, and retention goals. Report of Nettleton School District 78–79, ECF No. 17. One professional development session, focused on diversity, equity, and inclusion, is provided to all District administrators and teachers. *Id.* at 78. The other professional development session, focused on standardized, non-discriminatory hiring practices, is provided to all principals and administrators. *Id.* at 78–79.

In 2021, the District developed a Hiring Manager's Handbook and Rubrics, which was subsequently revised based on feedback from principals. *Id.* at 79. The Hiring Manager's Handbook was approved by the Board of Education in March 2023, and administrators were then trained on the Hiring Manager's Handbook and Rubrics. *Id.* The District's annual internal audit of its hiring practices revealed that all hiring committees used the appropriate rubric when hiring for the 2023-2024 school year. *Id.* The District plans to continue to conduct an annual internal audit of its hiring practices. *Id.* Within one month of the internal audit, the Community Advisory Committee will use data from the audit to conduct an annual review of – and recommend any necessary improvements to – the District's hiring processes, procedures, and practices. *Id.* at 77, 79.

**3. Retention**

The District demonstrated its commitment to retain black teachers. In the 2022-2023 school year, the District retained 100% of its black teachers. Report of Nettleton School District 80, ECF No. 17. In the 2023-2024 school year, the District retained 100% of its black teachers at the high school. Byars Aff. 3, ECF No. 21. At the junior high, the District retained 50% of its black teachers and hired three new black teachers. *Id.* Beginning in the 2022-2023 school year, the District began conducting exit interviews with all teachers separating from the District.

Report of Nettleton School District 80, ECF No. 17. These exit interviews allowed the District to gather data on why teachers left the District, to identify trends and areas of improvement, and to improve its retention of teachers. *Id.* The District plans to continue to conduct exit interviews to gather this important data. *Id.*

The District identified Nettleton's "hometown feel" as a way the District distinguishes itself from neighboring districts that are attempting to recruit and retain the same applicants. *Id.* at 74-75. To determine what, if any, role "hometown feel" plays in retaining black teachers, the District conducts a "Why Nettleton?" survey for teachers every Fall. *Id.* at 75. In this survey, the District asks teachers why they applied to work in the District, why they accepted a position in the District instead of another school district, and why they continue to teach in the District. *Id.* In the most-recent survey, a majority of the District's teachers indicated they continue to teach in the District because of the hometown, family-friendly culture of Nettleton. *Id.* Based on these results, the "hometown feel" of the Nettleton community is promoted on the District's website. *Id.* The District and the Community Advisory Committee also partner closely with the Nettleton Main Street Association to promote District events, offer teacher discounts at local businesses, and display school flags in downtown Nettleton. *Id.* at 74.

In the area of faculty, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, and is, therefore, entitled to a declaration of unitary status with respect to this *Green* factor.

## IV. CONCLUSION

Based on the foregoing information, the parties respectfully submit that the District has complied with the 2020 Consent Order for a reasonable period of time and has eliminated the vestiges of past *de jure* discrimination to the extent practicable. The Parties request that this Court enter an Order stating that the District has met the legal standards for a declaration of unitary status and is entitled to dismissal of this action.

Respectfully submitted,
October 7, 2024

FOR PLAINTIFF UNITED STATES OF AMERICA:

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

/s/ Christine Bischoff
SHAHEENA A. SIMONS, Chief
JONATHAN D. NEWTON, Deputy Chief
CHRISTINE BISCHOFF, Trial Attorney (NC #41792)
Educational Opportunities Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 10.216
Washington, DC 20530
Telephone: (202) 598-7149
Fax: (202) 514-8337
christine.bischoff@usdoj.gov

FOR DEFENDANTS NETTLETON LINE CONSOLIDATED SCHOOL DISTRICT, NETTLETON SUPERINTENDENT, and NETTLETON SCHOOL BOARD:

/s/ Gary Carnathan
GARY CARNATHAN
Carnathan Law Office
P.O. Box 70
Tupelo, MS 38802
Telephone: (662) 842-3321
carnathanlaw@redmagnet.com